UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MORRIS BART, L.L.C. | Case No. |
| Plaintiff, | |
| v. | District Judge |
| MCCLENNY MOSELEY & ASSOCIATES, PLLC, | Magistrate Judge |
| Defendant. | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Morris Bart, L.L.C. files this Complaint for Injunctive Relief and Declaratory Relief against McClenny Moseley & Associates, PLLC, respectfully representing as follows:

### PARTIES

1.     Plaintiff Morris Bart, L.L.C. is a Louisiana limited liability company, licensed to do and doing business in Louisiana, with its principal business office in New Orleans, Louisiana.

2.     Defendant McClenny Moseley & Associates, PLLC ("MMA") is a Texas professional limited liability company doing business in Louisiana, with its principal business office in Houston, Texas.

### JURISDICTION & VENUE

3.     Plaintiff Morris Bart is a limited liability company whose citizenship is determined by the citizenship of its members.  Morris Bart's sole managing member is a Louisiana citizen.

4.     Defendant MMA is a professional limited liability company whose citizenship is determined by the citizenship of its members.  Both members of MMA are citizens of Texas.

5.      This Court has jurisdiction over the parties to this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship as set forth above, and the amount in controversy exceeds $75,000.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this suit occurred in this district.

## BACKGROUND

7.      In 2020 and 2021, multiple hurricanes made landfall in Louisiana.  On August 27, 2020, Hurricane Laura, a Category 4 storm, made landfall in Cameron Parish and devastated Southwest Louisiana. Just over a month later, on October 9, 2020, Hurricane Delta came ashore in the same area as a Category 2 storm.  On October 28, 2020, Hurricane Zeta made landfall and caused catastrophic damage in Terrebonne Parish as a Category 3 storm.  The next year, on August 29, 2021, Hurricane Ida came ashore in Lafourche Parish as a Category 4 storm, the second-most intense hurricane to hit Louisiana after Hurricane Katrina.

8.      These four storms devasted communities across Louisiana, causing billions of dollars in damages and, relevant here, causing thousands of homeowners either to lose their properties or incur significant damages requiring repair.

9.      MMA, a Texas law firm, saw opportunity in this devastation. As homeowners across the state began to rebuild, MMA preyed on these vulnerable Louisiana residents through massive advertising and solicitation campaigns designed to enrich MMA, with little regard for making whole the people MMA would take on as clients.

10.      Upon information and belief, MMA's acquisition of clients with Hurricane Laura, Delta, Zeta, and Ida claims was accomplished in two principal ways. For some clients, MMA used an Alabama-based roofing company, Apex Roofing and Restoration, LLC, as a "runner" to sign

up clients while purporting to offer roof repair services in exchange for signing a document granting Apex permission to communicate with the insurer, which actually purported to be an assignment of the client's rights under their insurance policy. For others, MMA paid a marketing firm doing business as "Velawcity" also to act as a "runner," by advertising and communicating with potential hurricane clients. Pursuant to contracts between MMA and Velawcity, MMA paid Velawcity, at least in part, on a "per client" basis.

## THE APEX SCHEME

11.    Upon information and belief, client acquisition through the Apex-MMA scheme was generally effectuated in the following way. First, Apex would canvass neighborhoods in Louisiana affected by Hurricanes Laura, Delta, Zeta, or Ida.

12.    When Apex identified a residence with possible hurricane damage, an Apex representative would approach the owners of the residence to inquire as to whether the property had suffered roof damage in one of the storms and/or whether the owner would permit Apex to inspect the property for possible roof damage.

13.    If Apex determined there was damage to the residence's roof, Apex would then offer to make repairs to the roof in exchange for payment by the owner only of the owner's homeowner's insurance deductible, if the owner would give Apex permission to make a claim under the owner's insurance policy for the roof damage.

14.    Apex would then obtain an "Assignment of Benefits" (an "AOB") from the property owner, through which Apex purported to receive an assignment of "any and all rights, benefits, proceeds, and causes of action" under the owner's insurance policy. Apex entered these AOBs without regard to whether the insurance policy or benefits provided thereunder were actually assignable by the terms of the policies. Apex would represent to the property owner that

this AOB was necessary for Apex to communicate with the insurer regarding the owner's roof damage.

15.    Apex would also have the property owner assign a "Work Order" providing for the repairs Apex was to perform. Neither the AOB nor the Work Order that Apex furnished to property owners contained any reference to MMA or to any legal representation of the property owner.

16.    But thereafter, and unbeknownst to the property owner, Apex would provide the owner's information to MMA. An "Attorney Employment Contract" would then be created, establishing MMA's representation of *Apex* in order to pursue the property owner's insurance claims.  Where a "Client Signature" was required, a representative of Apex would sign "obo," in other words, purportedly on behalf of, the property owner.

17.    MMA would then commence to send a letter of representation to the owner's insurance company, representing to the insurer not that MMA was counsel to Apex but that MMA was counsel to the *property owner*. This letter of representation would request that MMA be listed as payee on any payment of insurance proceeds made after receipt of the letter, and that any such payment be sent to MMA's headquarters in Houston.

18.    In some instances, property owners became aware of MMA's existence, typically because those owners reached out to Apex to inquire as to the status of receipt of insurance proceeds and the repairs Apex had promised to make.  In response, Apex would explain to these owners that "its lawyers" were going to get involved.

19.    These property owners thus understood MMA to be representing Apex's interests, not their own.  But Apex often told the owners that "its lawyers" required the owners to sign certain forms so that the lawyers could communicate with the insurers.

20.     Owners would thereafter receive e-mails on behalf of Apex or MMA that might include some limited information about a fee being taken out of the insurance proceeds if a lawsuit was filed by the attorneys, who again, the owners believed to be representing Apex.  The owners would be provided with a link to enter their e-signature, which MMA would use to create another "Attorney Employment Contract," this one purporting to create an attorney client relationship between MMA and the property owner.

21.     Although MMA was purporting to represent these property owners, it rarely communicated with its "clients" and often took action without their clients' knowledge or permission.

22.     For example, in many cases, MMA ultimately filed lawsuits on behalf of these property owners, either in this Court, the United States District Court for the Middle District of Louisiana, or the United States District Court for the Western District of Louisiana.  These suits were often, if not always, filed without the knowledge of the property owners. The lawsuits were generic, form complaints, with no specific information about the property owners' damage or insurance policies. MMA did not provide copies of these lawsuits to its "clients" for their review before filing, nor did they provide the "clients" copies for their records after filing.

23.     MMA also often invoked appraisal under the insurance policies without the knowledge or consent of the property owners. MMA often engaged in mass negotiation with these insurance companies without ever informing its "clients" of the fact of substance of these negotiations.

24.     In some instances, after invoking appraisal, MMA would receive a settlement offer from the insurance company in the amount of an appraisal to which MMA's appraiser had agreed. Insurance companies would often issue a check with these settlement funds made out to MMA and

to the property owner.  Some property owners thus learned for the first time that MMA purported to represent them upon receipt from MMA of a settlement statement, with a 33% or 40% contingency fee deducted for MMA.  This fee was imposed on MMA's "clients" despite MMA having performed little to no work on the file other than invoking appraisal.

25.     As property owners began to realize that MMA existed and was apparently purporting to represent them, many sought to communicate with MMA about the status of their hurricane claims. These "clients," however, could rarely, if ever, get in touch with an actual attorney employed by MMA, because, upon information and believe, MMA outsourced client communications to Velawcity, as detailed more fully below.  MMA's failure to reasonably inform, consult, or respond to these "clients" caused these property owners to remain in the dark about the status of their insurance claims.

## THE VELAWCITY SCHEME

26.     Upon information and belief, client acquisition through the Velawcity-MMA scheme was generally effectuated in the following way.  Initially, MMA engaged Velawcity to perform "marketing" services for MMA.

27.     Pursuant to this arrangement, Velawcity ran a campaign to target potential clients who were affected by Hurricanes Laura, Delta, Zeta, or Ida.

28.     Upon information and belief, Velawcity both purchased advertising on Facebook and sent correspondence directly to potential clients, via United States mail, e-mail, or text messaging.

29.     Also upon information and belief, neither these Facebook advertisements nor the letters, e-mails, or text messages were marked as "ADVERTISEMENTS," and none made any specific reference to MMA.

30.     When potential clients responded to the advertisements, either by clicking a hyperlink in the internet-based ads or by calling a phone number listed in the letter communications, they would eventually be connected to a call center that upon information and belief was operated by Velawcity, not by MMA.

31.     During these calls with potential MMA clients, Velawcity employees assessed whether a potential client was eligible to pursue a claim with MMA and encouraged them to sign up with MMA if Velawcity determined they were so eligible.

32.     Velawcity would thereafter send to an eligible client an e-mail link to e-sign an "Attorney Employment Contract" with MMA.  At no point in any of this correspondence did anyone from MMA speak to any of these potential clients or explain to their clients the contingency-fee contracts they were signing.

33.     Upon receipt of the e-signed "Attorney Employment Contract," Velawcity would create an intake form for each client, assigning to them a "Velawcity ID":



### Intake Survey

Claim:          Storm Damage
Date:           3/2/2022
Campaign:       MMAP - Krause and Kinsman (Storm Damage)
Velawcity ID:   a025G00000p3hLdQAI

Upon information and belief, this ID was created because part of the way MMA paid Velawcity was on a per-client basis for each client contact obtained through this scheme.

34.     The intake forms created by Velawcity and/or MMA highlight another aspect of the Velawcity scheme. Upon information and belief, MMA entered into "joint ventures" with multiple other out-of-state law firms such as Krause & Kinsman (a Kansas law firm) and Galindo Law (a Texas firm) pursuant to which MMA agreed to split contingency fees with those other law

firms. In some cases, upon information and belief, this fee split was not disclosed at any time to MMA's clients. In other cases, it was disclosed in a footnote in the "Attorney Employment Contracts." But upon information and belief, in many instances, MMA did not provide to potential clients the contracts containing this footnote disclosure before it imposed their e-signature on the documents.  These clients were therefore unaware of the fee split at the time they agreed to allow MMA to take their cases.

35.    Moreover, MMA attorneys have recently admitted that at least some of these law firms with whom they joint ventured performed only technology assistance,  rather than meaningful legal work.

36.    Just as with "clients" obtained through the Apex scheme, MMA ultimately filed lawsuits on behalf of clients obtained through the Velawcity scheme, usually without the knowledge or reasonable consent of those clients. And just as with suits filed for clients procured through the Apex scheme, the suits filed on behalf of these clients were generic, form complaints, with no specific information about the property owners' damage or insurance policies.  MMA did not provide copies of these lawsuits to its clients for their review before filing, nor did they provide the clients copies for their records after filing.

37.    For its clients obtained through the Velawcity scheme, MMA also often invoked appraisal under their insurance policies without the clients' knowledge or consent. For these clients, too, MMA would engage in mass negotiation with these insurance companies without ever informing its clients of the fact of substance of these negotiations.

38.    Clients obtained through the Velawcity scheme also over time sought to communicate with MMA about the status of their hurricane claims. Like those clients obtained

through the Apex scheme, these clients could rarely, if ever, get in touch with an actual attorney employed by MMA, and therefore remained in the dark about the status of their insurance claims.

### MMA'S SCHEMES UNRAVEL

39.     MMA ultimately filed hundreds of lawsuits on behalf of clients obtained through the Apex and Velawcity schemes in the federal courts of this state.  As those suits began to progress through the court system, MMA's schemes began to unravel.

40.     In the United States Court for the Western District of Louisiana, for example, just two months after MMA filed more than 1600 lawsuits in the two to three days on the eve of the Hurricane Laura prescriptive period, Judge Cain convened a hearing with MMA lawyers to discuss his "concerns" with MMA's practice of law in the Western District.

41.     One such concern was the extreme burden MMA imposed on the judiciary through its eleventh-hour filing of hundreds of lawsuits. As Judge Cain noted, MMA's attitude about this burden was cavalier—it posted a video to Facebook featuring attorneys drinking daiquiris while purporting to work on client files and boasting about "breaking" the court's electronic filing system. *See* https://www.dropbox.com/s/e5y5rdfi9a0bi3u/MMA%20Video.mp4?dl=0.

42.     At that hearing, Judge Cain also expressed his disbelief that MMA was ethically representing clients in light of their use of a "call center" to communicate with clients and their proposal to "mass mediate" claims on behalf of dozens or hundreds of clients at a time.  Judge Cain noted that in multiple instances MMA had filed duplicate lawsuits on behalf of the same property owners.  MMA had also filed lawsuits on behalf of property owners against insurance companies who did not issue policies to those property owners.  Moreover, MMA was charging a 40% contingency fee for this work which Judge Cain referred to as "highway robbery."

43.     Due to these concerns, Judge Cain stayed indefinitely all cases in the Western District filed by MMA.

44.     MMA did nothing to alleviate these concerns. In fact, at a December 13, 2022 hearing again in front of Judge Cain, additional issues came to light. MMA had filed lawsuits in the Western District for "clients" who were represented by other parties and who had already settled their claims with insurance companies. In one case, MMA filed a lawsuit on behalf of a client after he explicitly discharged them. There were also lawsuits filed by MMA in the Western District claiming damage from Hurricane Ida and lawsuits claiming hurricane damage by property owners as far north as Monroe or Ruston.

45.      In one particularly troubling example, MMA had stamped an endorsement on a settlement check on behalf of a mortgage holder based on a purported power of attorney granted by that mortgage holder.  The mortgage holder, however, appearing in court, testified he had never granted any such power of attorney to MMA.

46.     In another troubling example, MMA attorneys acknowledged they had agreed to a "joint venture" with another law firm with whom MMA would split any attorneys' fees ultimately recovered—without disclosing this fee-splitting arrangement to MMA's clients whose cases were apparently subject to this joint venture.

47.     MMA's schemes came to light in this District as Hurricane Ida claims made their way through the court system. In January of this year, Magistrate Judge North held a hearing in *Franatovich v. Allied Trust Insurance Company*, No. 22-2552, during which the plaintiff in that case explained how she had become ensnared in MMA's Apex scheme despite explicitly informing Apex that she did not want or need them to utilize any lawyer to aid Apex in repairing her roof. Evidence adduced through that hearing confirmed that MMA would purport to represent both

Apex and property owners' interests after Apex obtained an AOB from a property owner and exemplified MMA's practice of relying on electronic signatures obtained through text message communications to establish a purported attorney-client relationship.

48.     Recently, Judge North held another hearing to receive testimony from an MMA "client" who has now engaged Morris Bart. In that case, *Falgout v. Allstate Indemnity Co.*, No. 22-5215, Apex induced the plaintiff, Charles Falgout, to enter into an AOB on the basis that it was necessary to communicate with the insurance company. The insurance policy, however, is not assignable by its terms. As is typical of the Apex scheme, MMA entered into an "Attorney Employment Contract" with Apex. Then, unbeknownst to Mr. Falgout and without his permission, MMA communicated with his insurance company on his behalf and invoked appraisal.  Later, MMA obtained through e-mail an e-signature from Mr. Falgout which it used to create an "Attorney Employment Contract" with Mr. Falgout. MMA eventually filed a lawsuit for Mr. Falgout without his knowledge.

49.     Eventually, on March 3, 2023, MMA's lead Louisiana attorney, William Huye, was temporarily suspended from practicing law in Louisiana. On March 4, 2023, MMA and its attorneys were suspended from practice in the Western District for 90 days.  This Court and the United States District Court for the Middle District of Louisiana thereafter stayed all cases filed by MMA pending further orders from the respective courts.

50.     Upon information and belief, MMA does not currently employ any attorney who is licensed to practice law in Louisiana.

51.     The fallout from MMA's schemes is enormous. MMA's suspensions resulted in hundreds of Louisiana property owners having no legal representation to pursue their hurricane claims in pending lawsuits. There are also potentially thousands of Louisiana property owners with

hurricane claims on whose behalf MMA has not yet filed suit, and whose property damage claims remain in limbo as the Hurricane Ida prescription date approaches later this year. These "clients" on whose behalf MMA has not yet filed suit were, upon information and belief, also obtained through the Apex or Velawcity schemes and the representations are plagued with the same lack of communication and undisclosed fee splitting arrangements as those clients on whose behalf MMA has already filed suit.

## MMA'S INTERFERENCE WITH MORRIS BART'S BUSINESS RELATIONS AND UNAUTHORIZED PRACTICE OF LAW

52.     Plaintiff Morris Bart is a Louisiana law firm with over 40 years of experience representing plaintiffs in personal injury and property damage suits against insurers.  Morris Bart has offices throughout Louisiana and employs approximately 100 attorneys, with at least 33 dedicated solely to handling hurricane claims.

53.     In the wake of MMA's suspension from the practice of law in Louisiana, hundreds of former MMA clients contacted Morris Bart to obtain substitute representation.

54.     If, after initial intake interviews, Morris Bart agrees to take on a former MMA client, it shortly thereafter assists its client in sending to MMA a letter informing MMA that the client no longer wishes to retain MMA's services and has instead hired Morris Bart to pursue its hurricane claims.

55.     In multiple instances, MMA has continued to contact its former clients now represented by Morris Bart even after receipt of these letters.  Some representative examples of this conduct include:

> a.  On March 21, 2023, Morris Bart sent a termination letter to MMA on behalf of a client who had now engaged Morris Bart. The *same day*, that former "client" (who was signed up via the Apex scheme and had not even realized MMA purported to

act as his attorney until March 2023) was contacted by MMA multiple times with the message that it was "urgent" that he sign settlement checks issued by his insurance company to him and to MMA.

b. Another current Morris Bart client informed MMA on March 23, 2023 that he was now pursuing his claim with Morris Bart, rather than MMA.  Weeks later, on April 10, 2023, that client received an email from MMA acknowledging that he had "requested that our firm disengage you from representing you in this matter." Despite this acknowledgment, the e-mail went on to admonish the client that MMA "must take additional action in the case to either protect your rights so you can continue pursuing your claim, or dismiss the case in its entirely [sic] which will result in you losing your rights to continue pursuing your claim for damages."

c. Yet another client sent to MMA a termination letter dated April 3, 2023, informing MMA that he was now represented by Morris Bart.  Shortly after, that client received a message from MMA explaining they had sent him paperwork for him to "review and sign" so that another law firm (not Morris Bart) could "continue moving [his] storm damage claim forward."  MMA then followed up with an e-mail referencing this text message on April 10, 2023.

d. Another client now represented by Morris Bart sent to MMA a termination letter dated April 12, 2023, advising MMA that he had retained Morris Bart.  Three days later, that client received a text message from MMA advising him that MMA was "continuing to make connections for co-counsel" and would soon be in touch to connect plaintiff with "another stellar law firm."

e.  In perhaps the most egregious example, on April 21, 2023, Morris Bart sent to MMA via e-mail a discharge letter on behalf of a client who had chosen to terminate MMA and retain Morris Bart. Shortly after this e-mail was sent, a courier's office contacted that client to set up an appointment to sign settlement paperwork. A representative from the courier's office then arrived at the client's house with paperwork for a settlement payment less a 33% contingency fee for MMA. That client had never been informed by MMA that it had reached a settlement with his insurance company.

56.    MMA has also attempted to divert clients from seeking representation by Morris Bart.  Specifically, upon information and belief, MMA has relationships with other law firms through which it will receive a referral fee for sending its former clients to those firms and/or through which the other law firm has agreed that MMA has the right to assert a quantum meruit interest in a portion of any attorneys' fees recovered in that former client's suit. Because MMA has a monetary interest in its former clients signing up to be represented by these law firms other than Morris Bart, and despite MMA currently employing no lawyer who can practice law in Louisiana, MMA has contacted its former clients to offer the services of those law firms, even after MMA received letters informing them that their former clients are now represented by Morris Bart.

57.    Morris Bart, unlike MMA, employs dozens of Louisiana lawyers who communicate personally with clients throughout the course of their representation to ensure that those clients are informed and their interests are represented fairly.  As MMA has continued to send these confusing correspondences to clients it no longer represents, Morris Bart attorneys have been required to reallocate time and resources that would ordinarily be spent on representing their clients' interests

to attempting to stop MMA from making these overtures in violation of Louisiana professionalism rules.

58.    Further, as these former MMA clients sign up with Morris Bart, attorneys with the firm have begun to enroll in cases filed by MMA on those clients' behalf.  Pursuant to court orders setting deadlines for intervention, MMA, now withdrawn as counsel, has begun to seek to intervene in those lawsuits.

59.    In their proposed intervention complaints, MMA seeks to be paid "reasonable attorneys' fees" from any proceeds recovered by Morris Bart's now-clients because, MMA asserts, it "performed meaningful and substantial legal work" for these clients.  Morris Bart is thus also now expending time and resources to respond to these baseless claims for attorneys' fees.

## CAUSE OF ACTION NO. 1: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

60.    Morris Bart re-alleges each of the foregoing paragraphs as though fully stated herein.

61.    By continuing to contact its former "clients" who are now represented by Morris Bart and by encouraging some of those clients to sign up with other law firms, despite Morris Bart's current representation of the clients, MMA has intentionally interfered with Morris Bart's business relations with these clients.

62.    This interference is being done with actual malice, because MMA is aware that Louisiana law prohibits attorneys from contacting represented parties.

63.    MMA's interference is also being done in attempt to improperly influence MMA's former clients not to deal with Morris Bart, because MMA has a financial interest in these clients retaining other law firms who may agree to (or at least not object to) MMA collecting some portion of a fee from these clients' recoveries.  Alternatively, MMA has a financial interest in these clients

continuing to be represented by the out-of-state law firms with whom MMA joint ventured to share in any eventual fees recovered by these clients.

64.     For this conduct, Morris Bart seeks injunctive relief in the form of an order prohibiting MMA from contacting its former clients who are now represented by Morris Bart and to otherwise cease interfering in Morris Bart's business relations.

65.     Morris Bart also seeks injunctive relief in the form of an order mandating that MMA immediately furnish its original files and work product, including any information stored in MMA's Smart Advocate software system, and an order mandating that MMA notify the insurers of clients now represented by Morris Bart to whom MMA has sent letters of representation that MMA no longer represents these clients.

<u>**CAUSE OF ACTION NO: 2: FOR VIOLATIONS OF LOUISIANA REVISED STATUTES SECTION 37:213**</u>

66.     Morris Bart re-alleges each of the foregoing paragraphs as though fully stated herein.

67.     Louisiana Revised Statutes § 37:213 provides that no natural person who is not duly authorized and admitted to practice law in Louisiana, and no corporation, professional law corporation, partnership, or limited liability company composed of natural persons who are not duly authorized and admitted to practice law in Louisiana, may practice law; furnish attorneys or counsel to render legal advices; hold itself out to the public as being entitled to practice law; render or furnish legal services or advice; assume to be an attorney or counselor at law; assume, use, or advertise the title of lawyer, attorney, or equivalent terms to convey the impression that it is a practitioner or law; or in any manner advertise that it owns, conducts, or maintains an office of any kind for the practice of law.

68.     MMA's continuing conduct with respect to its former clients now represented by Morris Bart violates Louisiana Revised Statutes § 37:213, because MMA's contacting clients to provide advice related to their claims and continued attempts to negotiate settlements on behalf of these clients constitute the practice of law, but MMA employs no attorney licensed to practice law in Louisiana.

69.     Pursuant to Louisiana Revised Statutes § 37:213.1(D)(1), which provides that any aggrieved person may petition to enjoin an actor to engage in the unauthorized practice of law, Morris Bart seeks an injunction prohibiting MMA from continuing to engage in the unauthorized practice of law, as set forth above and throughout this Complaint.  Morris Bart also seeks costs and attorneys' fees incurred in bringing this injunction, as permitted by the statute.

## CAUSE OF ACTION NO. 3: FOR A DECLARATION THAT MMA ATTORNEY EMPLOYMENT CONTRACTS ARE ABSOLUTELY NULL

70.     Morris Bart re-alleges each of the foregoing paragraphs as though fully stated herein.

71.     In Louisiana, a contract is absolutely null when it violates a rule of public order. La. Civ. Code. art 2030. Absolute nullity may be invoked by any person. *Id.*

72.     Pursuant to Louisiana Civil Code article 2030, Morris Bart seeks a declaration that any "Attorney Employment Contracts" between MMA and clients who are now engaged by Morris Bart are absolutely null.

73.     As to "Attorney Employment Contracts" procured through the Apex scheme, Morris Bart seeks a declaration that these contracts are absolutely null, such that MMA has no right to claim a lien for attorneys' fees pursuant to those contracts, for the following reasons:

a. "Attorney Employment Contracts" procured through the Apex scheme arise out of Apex and MMA's illegal relationship through which Apex and MMA conspired to practice law together.

b. "Attorney Employment Contracts" procured through the Apex scheme created a concurrent conflict of interest, because MMA purported to represent both Apex and the property owner, without any waiver of the concurrent conflict.

c. "Attorney Employment Contracts" procured through the Apex scheme required property owners to execute AOBs that were typically in violation of the terms of the insurance policies purportedly being assigned.

74.     As to "Attorney Employment Contracts" procured through the Velawcity scheme, Morris Bart seeks a declaration that these contracts are absolutely null, such that MMA has no right to claim a lien for attorneys' fees pursuant to these contracts, for the following reasons:

a. "Attorney Employment Contracts" procured through the Velawcity scheme arise out of Velawcity and MMA's illegal relationship through which Velawcity and MMA conspired to practice law together.

b. "Attorney Employment Contracts" procured through the Velawcity scheme are the result of an agreement pursuant to which MMA paid Velawcity a "per-client" fee for each contract procured, in violation of Louisiana law.

75.     As to "Attorney Employment Contracts" entered into with clients where MMA did not disclose to those clients that MMA had agreed to split fees with another law firm or firms, Morris Bart seeks a declaration that these contracts are absolutely null, such that MMA has no right to claim a lien for attorneys' fees pursuant to these contracts, because it failed to disclose the fee splitting arrangement in violation of Louisiana Rule of Professional Conduct 1.5.

76.     An actual controversy exists between Morris Bart and MMA, thus rendering Morris

Bart's request for a declaratory judgment ripe for adjudication, because MMA is currently seeking

to assert statutory lien interests for attorneys' fees in suits in which Morris Bart is now representing

MMA's former clients, and Morris Bart now has been or will be forced to respond to those

interventions to protect its clients' and its own interests.

### CAUSE OF ACTION NO. 4: FOR A DECLARATION THAT MMA IS NOT ENTITLED TO ATTORNEYS' FEES PURSUANT TO ANY OF ITS ATTORNEY EMPLOYMENT CONTRACTS

77.     Morris Bart re-alleges each of the foregoing paragraphs as though fully stated

herein.

78.     Louisiana Rule of Professional Conduct 1.5 provides that a lawyer shall not make

an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses.

79.     Rule 1.5 also requires that attorneys disclose the basis or rate of the fees and

expenses for which the client shall be responsible, preferably in writing, "before or within a

reasonable time after commencing the representation."

80.     With respect to contingent fees, Rule 1.5 requires that a contingent fee arrangement

be in writing, signed by the client, and state the method by which the fee is to be determined.

81.     Rule 1.5 also provides that contingent fees may not be split between lawyers not in

the same firm unless that split is disclosed to the client in writing, the total fee is reasonable, and

each lawyer renders meaningful legal services to the client.

82.     Separately, Louisiana Rule of Professional Conduct 1.4 requires lawyers to, *inter

alia*,  promptly inform their clients of any decision or circumstance with respect to which the

client's informed consent is necessary;  to reasonably consult with the client about the means by

which the client's objectives are to be accomplished; to promptly comply with reasonable requests

for information; and give the client sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued.

83.     Louisiana Rule of Professional Conduct 1.7 prohibits lawyers from representing a client if the representation will be directly adverse to another client or significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client.

84.     MMA's conduct in its representation of its former clients who are now represented by Morris Bart violated all of these rules of professionalism.

85.      MMA violated Rule 1.5 by failing to inform clients of contingency fee splitting arrangements, failing to disclose its contingency fee to clients in writing before or within a reasonable time after it commenced its representation, and by charging an unreasonable contingency fee, particularly in light of the "work" MMA performed for its clients and the fact that its joint venture partners were not performing meaningful legal services.

86.     Because of MMA's violations of Rule 1.5, whose reasonable fee factors are utilized to perform the quantum meruit analysis into what percentage of a fee a discharged attorney should be awarded (which is then reduced based on the nature and gravity of the cause for which the attorney was discharged), MMA will never be able to recovery any attorneys' fee award form any settlement or judgment in any of its former clients cases on a quantum meruit basis, because MMA obtained no results for any of its clients (other than in some cases obtaining settlements that the clients did not authorize), and dedicated almost no time to their clients' cases, as evidenced by their failure to inform clients of their communications with their insurers and their failure to inform clients that they were filing lawsuits on their behalf.

87.     MMA violated Rule 1.4 by failing to communicate with its clients about *any* decision requiring those clients' informed consent, including the decision to file lawsuits on those clients behalf, the decision to invoke appraisal on behalf of those clients, and the decision to negotiate for and subsequently accept settlement payments from the clients' insurance companies.

88.     MMA violated Rule 1.7 by concurrently representing (or purporting to represent) both Apex and property owners who had executed AOBs in favor of Apex.

89.     Where attorneys violate ethical rules, especially in a manner as egregiously as MMA did, disgorgement or denial of fees is an appropriate sanction.

90.     Because MMA is currently seeking to assert statutory lien interests for attorneys' fees in suits in which Morris Bart is now representing MMA's former clients, and because Morris Bart now has been or will be forced to respond to those interventions to protect its clients and its own interests, there exists an actual controversy between MMA and Morris Bart as to whether MMA should be denied the ability to recover these fees for its violations of the Louisiana Rules of Professional Conduct.

91.     Morris Bart thus seeks a declaration that MMA is not entitled to assert a claim for attorneys' fees in any suit in which Morris Bart now represents a former MMA client due to MMA's violations of the Louisiana Rules of Professional Conduct.

## **PRAYER FOR RELIEF**

92.     WHEREFORE, Morris Bart respectfully requests that after due proceedings are had, this Court enter judgments in favor of Morris Bart and against MMA,

a.  Issuing injunctive relief in the form of an order:

    i.  prohibiting MMA from communicating with clients now represented by Morris Bart and otherwise ordering MMA to cease interfering in Morris Bart's business relations;

    ii.  mandating that MMA immediately furnish its original files and work product, including any information stored in MMA's Smart Advocate software system;

    iii.  mandating that MMA notify the insurers of clients now represented by Morris Bart to whom MMA has sent letters of representation that MMA no longer represents these clients; and

    iv.  prohibiting MMA from continuing to engage in the unauthorized practice of law.

b.  Declaring that any "Attorney Employment Contracts" between MMA and its former clients now represented by Morris Bart that were procured (1) through the Apex scheme; (2) through the Velawcity scheme; or (3) without disclosing MMA's fee-splitting arrangements with other law firms are absolutely null, such that MMA has no right to claim an interest in any attorneys' fees pursuant to those contracts;

c.  Declaring that MMA is not entitled to assert a claim for attorneys' fees in any suit in which Morris Bart now represents a former MMA client due to MMA's violations of the Louisiana Rules of Professional Conduct;

d.  Awarding any and all attorney's fees, costs, and interest allowed by contract or law; and

e.  Awarding any and all other relief as may be just and equitable.

Dated:  May 1, 2023

Respectfully submitted,

**FISHMAN HAYGOOD, LLP**

/s/ *Kerry J. Miler*

Kerry J. Miller (La. Bar No. 24562), T.A.
Rebekka C. Veith (La. Bar No. 36062)
Carly E. Jonakin (La. Bar No. 40412)
FISHMAN HAYGOOD, LLP
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
Email: kmiller@fishmanhaygood.com
Email: rveith@fishmanhaygood.com
Email: cjonakin@fishmanhaygood.com

*Counsel for Morris Bart, LLC*